<u>**NOT FOR PUBLICATION**</u>                                    [8, 11, 12, 13]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<div style="overflow-x:auto;">

|  |  |  |
|---|---|---|
| _____ | : | |
| MONTGOMERY TOWNSHIP BOARD | : | |
| OF EDUCATION, | : | Civil Action No. 06-398 (FLW) |
|  | : | |
| Plaintiff, | : | **OPINION** |
| v. | : | |
|  | : | |
| S.C., on behalf of D.C., | : | |
|  | : | |
| Defendant. | : | |
| _____ | : | |

</div>

<u>**WOLFSON, UNITED STATES DISTRICT JUDGE**</u>

This Individuals with Disabilities Education Act ("IDEA") case concerns the school placement for Defendant D.C. ("D.C.") during the 2004-2005 school year, and Montgomery Township Board of Education's ("District") refusal to pay for the unilateral placement of D.C. at the Solebury School for that year. Defendant prevailed in the due process hearing before Administrative Law Judge ("ALJ") Joseph F. Fidler, who concluded that the IEP offered by the District for the 2004-2005 school year would not have provided D.C. with a free appropriate public education and that D.C.'s parents were therefore entitled to reimbursement for D.C.'s unilateral placement at the Solebury School for the 2004-2005 school year. Plaintiff filed a Complaint in this Court on January 27, 2006, appealing the ALJ's decision.

Before the Court are cross-motions for summary judgment by Plaintiff and Defendant, Defendant's motion for interim relief, and Plaintiff's cross-motion for a stay of the ALJ's

1

Dockets.Justia.com

decision.  The Court, having considered the papers submitted by the parties, and for good cause

shown, grants Defendant's motion for summary judgment, and denies Plaintiff's motion for

summary judgment.  As a result, consistent with the ALJ's opinion, D.C.'s parents are entitled to

reimbursement for D.C.'s tuition at the Solebury School for the 2004-2005 school year.  The

Court also grants Defendant's motion for interim relief, and therefore finds that the District is

responsible for D.C.'s tuition payments at Solebury beginning on August 22, 2005 under the

stay-put provision of the IDEA.  Finally, having decided the cross-motions for summary

judgment, the Court denies Plaintiff's cross-motion for a stay of the ALJ's decision as moot.

**I.    BACKGROUND**

**A.    INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 U.S.C. § 1400 <u>et seq.</u>**

The IDEA requires states receiving federal education funding to provide a "free

appropriate public education" ("FAPE") to all disabled children.  20 U.S.C. § 1412.  For each

child identified as eligible for special education, the IDEA requires the school district to develop

an Individualized Education Program ("IEP"), a written statement that is designed to ensure the

implementation of a FAPE for the child.  <u>S.H. v. State-Operated Sch. Dist. of Newark</u>, 336 F.3d

260, 264 (3d Cir. 2003).  In addition to defining the content required, IDEA provides that an IEP

should be developed considering the strengths of the child, concerns of the parents, and recent

evaluations of the child.  <u>Id.</u>  The team responsible for developing the IEP consists of the child's

parent(s), at least one of the child's special education teachers, a curriculum specialist, and, if the

parent or school board requests, a person with special knowledge or expertise related to the

child's education.  <u>Id.</u>; <u>see also</u> 20 U.S.C. § 1414(d)(1)(B).  IDEA further mandates that the team

review the IEP annually "to determine whether the annual goals for the child are being achieved."

20 U.S.C. § 1414(d)(4).

New Jersey's special education regulations are intended to fulfill the state's responsibilities under IDEA.  N.J.A.C. § 6A:14-1.1(b)(1).  Under IDEA and the New Jersey regulations, there is a strong preference for mainstreaming, or requiring education in the least restrictive environment.  20 U.S.C. § 1412(a)(5)(A).  The Third Circuit has interpreted this requirement as "mandating education 'in the least restrictive environment that will provide [the student] with a meaningful educational benefit.'"  S.H., 336 F.3d at 265 (quoting T.R. v. Kingwood Twp. Bd. Educ., 205 F.3d 572, 578 (3d Cir. 2000)).  "The least restrictive environment is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled."  Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir.1995).

IDEA does not require a school district to provide the best possible education for a child with a disability.  Bd. of Educ. v. Rowley, 458 U.S. 176, 189 (1982); Polk v. Central Susquehanna Intermediate Unit, 853 F.2d 171, 178 (3d Cir. 1988) (discussing Rowley, 458 U.S. at 189).  Rather, an IEP must provide "'meaningful' access to education and confer 'some educational benefit' upon the child for whom it is designed."  Ridgewood Bd. of Educ. v. P.S., 172 F.3d 238, 247 (3d Cir. 1999) (quoting Rowley, 458 U.S. at 192, 200).  To be appropriate under IDEA, however, this educational benefit must be more than "trivial," and must offer the potential for "significant learning" and "meaningful benefit."  Id.

A parent who believes a school district has not provided his or her child with a FAPE as required under IDEA may object to the IEP and request a due process hearing or mediation conference.  See Lascari v. Bd. of Educ., 560 A.2d 1180, 1183-84 (N.J. 1989) (citing applicable

3

New Jersey state regulations). New Jersey has further designated its Office of Administrative Law ("OAL") to hear special education complaints. L.P. v. Edison Bd. of Educ., 626 A.2d 473, 477 (N.J. Super. Ct. Law Div. 1993). The dispute is adjudicated by an ALJ, who has authority under the IDEA and New Jersey law to deem the IEP inappropriate. See id.; N.J.A.C. § 6A:14-2.7(n)-(o). Parents challenging the IEP may be entitled to reimbursement of their education costs if the ALJ finds that the IEP was inappropriate, Florence Cty. Schl. Dist. v. Carter, 510 U.S. 7, 12 (1993), if the parents complied with the notice and reevaluations requirements of the IDEA and New Jersey regulations, 20 U.S.C. § 1412(a)(10) and N.J.A.C. 6A:14-2.10(c), and if the parents cooperated with the school district, Patricia P. v. Board of Educ. of Oak Park, 203 F.3d 462, 468 (7th Cir. 2000). Aggrieved parties may appeal the ALJ's decision to a state or federal district court. 20 U.S.C. § 1415(i)(2).

Traditionally, the burden of proof to demonstrate compliance with IDEA had been upon the school district. The parent(s) needed only place the appropriateness of the IEP at issue, and the burden would shift to the school district to prove that the IEP was indeed appropriate. Recently, however, the Supreme Court changed the burden analysis. See Schaffer v. Weast, 546 U.S. 49, 126 S.Ct. at 537 (2005) ("burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief"). Following the Supreme Court's holding in Schaffer, the Third Circuit has held that "appellants bear the burden of proof when challenging the appropriateness of the relevant IEPs." L.E. v. Ramsey Bd. of Ed., 435 F.3d 384, 392 (3d Cir. 2006) (citing Schaffer, 546 U.S. 49, 126 S.Ct. at 537). In a situation where a child has been unilaterally placed by his or her parents in an educational setting contrary to the IEP, the parents may still be entitled to reimbursement, but only if the parents meet their burden of establishing

4

that the program proposed in the IEP was inappropriate "and if the parents demonstrate they have

acted in good faith." Lascari, 560 A.2d at 1191; see also 20 U.S.C. § 1412(a)(10)(C)(ii).  While

the burden of proof now lies with the party seeking relief, the focus of the Court's inquiry

remains evaluating "the IEP actually offered and not one that the school board could have

provided if it had been so inclined." Lascari, 560 A.2d at 1189.

**B.      PRIOR LITIGATION**

      The parties to this case are no strangers to litigation.  In a prior dispute between the

parties, the Honorable Stanley Chesler, U.S.D.J., affirmed an ALJ's decision regarding the

unilateral placement of D.C., by his parents, at the Newgrange School for D.C.'s fourth-grade

year.  In 1999, when D.C. was in third grade at Montgomery Township public school, he was

classified as eligible for special education and related services.  D.C.'s parents rejected the

District's IEP, which called for D.C. to be educated in the District's public schools for fourth

grade, and unilaterally enrolled D.C. at the Newgrange School.  D.C.'s parents then filed a

request for a due process hearing to obtain tuition reimbursement from the District for this

placement.  Following a hearing, the ALJ concluded that the District had not offered a FAPE to

D.C. and that his placement at Newgrange was appropriate.  The District was ordered to

reimburse D.C.'s parents for the tuition and to create a formal IEP for D.C.'s continued

placement at Newgrange.  On appeal, the Third Circuit affirmed the District Court's decision.

D.C. attended the Newgrange School until the close of the 2002-2003 school year.

      In 2003, another dispute arose between the parties, concerning D's placement for the

2003-2004 school year.  The District's IEP called for D.C. to continue at the Newgrange School,

but his parents rejected this IEP and unilaterally enrolled D.C. at the Bridge School.  Following a

due process hearing, the ALJ concluded that the District's IEP offered a FAPE, and denied

reimbursement for the unilateral placement at the Bridge School.  The Honorable Stanley

Chesler, U.S.D.J., affirmed the decision of the ALJ.  D.C. attended the Bridge School during the

2003-2004 year.

## C.    CURRENT DISPUTE

The instant dispute concerns D.C.'s school placement for the 2004-2005 academic year,

the year he was to enter ninth grade, or high school.  In Fall 2003, Nancy Novack, the Director of

Pupil Services for Montgomery Township Schools, discussed reevaluating D.C.'s eligibility for

special education with D.C.'s parents.  AR 52.  The District wanted to reevaluate D.C. to plan his

transition to high school as well as his post-secondary options.  Tonkin Tr. 20, 29.  D.C.'s

parents provided the District with a November 26, 2003 neuropsychological evaluation of D.C.

from Barbara L. Malamut, Ph.D.  Id. at 54-71.  To assess D.C.'s cognitive abilities, Dr. Malamut

administered the WISC-IV test, which showed that D.C. had average ability in verbal

comprehension, working memory, and full scale, and low average ability in perceptual reasoning

and processing speed.  Id. at 59.  Dr. Malamut also assessed D.C.'s academic abilities using the

WIAT-II (Wechsler Individual Achievement Test), which showed that D.C. had above average

math skills and low average written expression skills.  Id. at 64-65.  In addition, Dr. Malamut

assessed mood and behavior using the Behavior Assessment System for Children (BASC) rating

scales, as completed by D.C.'s parents, teachers, and D.C.  Id. at 57.  Dr. Malamut diagnosed

D.C. with Attention Deficit/Hyperactivity Disorder (ADHD), Predominantly Inattentive Type,

and Disorder of Written Expression.  Id. at 68.  Dr. Malamut also stated, "Emotionally, [D.C.]

appeared happy overall and much more comfortable with the testing than he had four years ago,

but he continues to demonstrate a shaky level of self-esteem.  As academic material becomes more advanced, [D.C.]'s ability to perform consistently in school will suffer without continued intervention.  Moreover, given his fragile level of confidence and comfort in the academic and social settings, he is at great risk of recurring symptoms of anxiety and depression if placed in a nonsupportive academic environment."  Id.  Dr. Malamut also made numerous recommendations for D.C.'s education, including small class size, extra time, assistance with notes, being engaged as an active participant during class, and a highly structured setting.  Id. at 68-70.

The IEP team met on March 30, 2004 to plan D.C.'s reevaluation for special education. Id. at 72.  At the meeting were the members of the District's child study team – learning disabilities teacher consultant Joanne Tonkin, school psychologist Stacy Shanks[1], and social worker Jody Budoff – as well as regular education teacher Kathleen Blake, special education teacher Jennifer Martin, social worker John Mazellan, and D.C.'s parents.  Id. at 72.  The child study team accepted Dr. Malamut's report in part, specifically accepting the scores for the cognitive and academic testing done by Dr. Malamut, as well as the BASC parent, teacher, and student rating scales for mood/behavior, but did not accept Dr. Malamut's conclusions or recommendations.  Id. at 76-77.  The child study team also administered additional tests – fluency tests, a writing test, and an algebra test.  Tonkin Tr. 26-28, 58; AR 74.  In addition to the testing done by Dr. Malamut and the child study team, the reevaluation process included observation of D.C. by learning disabilities teacher consultant Joanne Tonkin; Ms. Tonkin's interview of D.C.'s teacher, Ms. Barrett, with D.C.'s father present; evaluations by D.C.'s

---

[1]Subsequent to these events but prior to the hearing before the ALJ, Stacy Shanks changed her name to Stacy Shanks-Kohler.

teacher, Ms. Barrett; an interview of D.C. by school psychologist Stacy Shanks; an interview of

D.C.'s parents by social worker Jody Budoff; and an occupational therapy evaluation.  Tonkin

Tr. 40; AR 84.

D.C.'s parents also arranged for Yitzhak Shnaps, M.D., a psychiatrist who had been

treating D.C. since 2001, to write a letter to the District on June 29, 2004.  AR 107-09.  Dr.

Shnaps stated in his letter that D.C. suffered from Depression, NOS with anxious and obsessional

features; Attention Deficit Hyperactivity Disorder, Predominantly Inattentive type; Learning

Disability; Disorder of Written Expression; and Fine Motor Developmental Delay.  Id. at 109.

Dr. Shnaps also stated that D.C. was taking stimulant medication, antidepressant medication, and

medication for insomnia.  Id. at 108.  Dr. Shnaps further wrote that he had been working with

D.C. since the fifth grade and that while "[t]he outside impression is that [D.C.] comes across as

well related, well groomed and appropriate... all along my impression has been that under this

pleasant demeanor his mood has been in essence depressed and anxious."  Id.  Dr. Shnaps further

commented, "The quality of [D.C.'s] thinking process regarding school work is obsessional and

ruminative.  It is clear that reading, writing, comprehension and organization are formidable tasks

for him.  In addition, the high level of associated anxiety adds to his sense of anguish and

depression and at times results in a state of emotional paralysis.  Therapy also focused on

examining painful and traumatic events in his life.  His perception of the three years that he spent

in the public school is that it was a time of despair, feeling lost, isolated, anxious and at times

giving up on life altogether."  Id.  Dr. Shnaps concluded that D.C. needed to be in a special needs

school and that "in a different environment he is at high risk for emotional decompensation and

ongoing crisis the outcome of which it will be difficult to predict."  Id. at 109.

The IEP team met with D.C.'s parents on July 1, 2004, to discuss the District's determination of eligibility report.  AR 104; Tonkin Tr. 36.  At this meeting, the IEP team could not determine D.C.'s eligibility for special education because the team still needed to ask Dr. Shnaps questions pertaining to his psychiatric report, which had been submitted only two days before the meeting.  Tonkin Tr. 36.  On July 7, 2004, Jody Budoff, the school social worker, sent Dr. Shnaps follow-up questions based on his letter, and Dr. Shnaps responded on July 12, 2004.  AR 110-12.

On July 13, 2004, the IEP team accepted Dr. Shnaps' report in part, specifically accepting the portion of the report which dealt with D.C.'s current diagnosis and medication, but did not accept Dr. Shnaps' placement recommendations.  AR 113-14.  That same day, the IEP team met to discuss the District's eligibility determination report.  Id. at 115, 122.  While D.C.'s parents agreed with the child study team that D.C. was eligible for special education, they did not agree with the specifics of the eligibility determination report and requested a number of changes.  Id. at 123-25.  On July 15, 2004, the IEP team met to discuss the District's proposed IEP for the 2004-2005 school year.  At the meeting, the team presented an IEP in which D.C. would be enrolled in the 8th grade at Montgomery Middle School and thus, be repeating that year of school.  Id. at 126.  The District proposed the middle school placement to facilitate D.C.'s transition to high school, since he had not been in the District's schools since the third grade.  Tonkin Tr. 93.  On July 29, 2004, D.C.'s parents wrote to Joanne Tonkin rejecting the District's proposed IEP because repeating the 8th grade "would have devastated [D.C.]."  Id. at 151-53.

On August 10, 2004, D.C.'s parents met with Joanne Tonkin, Jody Budoff, and Stacy Shanks to discuss the District's new IEP in which D.C. would be enrolled in the 9th grade at

Montgomery High School.  Tonkin Tr. 102; AR 164.  The IEP included in-class support World

Studies and Physics, which are regular education classes where, in addition to the regular teacher,

there is a special education teacher to provide suggestions and modifications.  Tonkin Tr. 68,

102.  The IEP also included replacement English 9 and Learning Strategies, which are special

education classes.  Tonkin Tr. 103; AR 163.  There was also a provision for counseling four

times a month.  AR 163.  On August 24, 2004, D.C.'s parents wrote a letter to Nancy Novack

and Joanne Tonkin rejecting the IEP that was presented on August 10, 2004, and requesting

placement at the Solebury School.  Id. at 416-18.  On August 30, 2004, the District rejected the

request to place D.C. at the Solebury School.  Id. at 419.  D.C.'s parents enrolled D.C. at the

Solebury School for the 2004-2005 school year, and D.C.'s mother, S.C., filed a request on

D.C.'s behalf for a due process hearing on September 22, 2004.

A hearing was held before ALJ Joseph F. Fidler on January 14, February 14 and 17,

March 2 and 3, and April 5 and 6, 2005.  On December 22, 2005, the ALJ issued a decision in

which he concluded that the IEP offered by the District would not have provided D.C. with a

FAPE for the 2004-2005 school year and that D.C.'s parents were entitled to tuition

reimbursement for the unilateral placement of D.C. in the Solebury School Learning Skills

Program for that year.  AR 29-30.  The ALJ stated that "[k]ey to resolution of this matter is the

appropriate weight to accord to the expert opinions;" he found that the testimony of Dr. Malamut

and Dr. Shnaps was entitled to substantial weight because of these experts' "long-term and

extensive involvement evaluating and treating [D.C.]" and "keen understanding of the

educational significance of [D.C.]'s emotional stability."  Id. at 28-29.  The ALJ also found that

while the District's witnesses were "competent, caring professionals," they "gave inadequate

consideration to the findings and recommendations of Drs. Malamut and Shnaps." Id. at 28.  The ALJ thus found that "[D.C.] is motivated to do well, but he experiences school tasks as a source of great anxiety and obsessional thinking and demonstrates a shaky level of self-esteem. [D.C.]'s academic progress is dependent on his emotional stability, and in light of his fragile self-esteem, organizational deficits, and slow processing speed, he needs highly structured classes of small size with hands on attention so that his engagement as an active participant in lessons can be facilitated." Id. at 29.  The ALJ further found that "[D.C.] would be at great risk of recurring symptoms of anxiety and depression that would interfere with his learning if he were placed in the public high school program proposed by respondent school district" and  that "respondent school district's proposed IEP was not reasonably calculated to provide [D.C.] with a meaningful educational benefit because it failed to give sufficient consideration to [D.C.]'s disabilities in the context of his underlying issues of anxiety and fragile self-esteem." Id.  Because the District and D.C.'s parents agreed that the Solebury School satisfied the appropriateness standard for unilateral private placement, the ALJ concluded that D.C.'s parents were entitled to tuition reimbursement for the unilateral placement of D.C. in the Solebury School for the 2004-2005 school year.

The District filed a Complaint in this Court on January 27, 2006, appealing the ALJ's decision.  On August 16, 2006, D.C.'s parents filed a motion for interim relief, seeking on-going payment for D.C.'s placement at Solebury based upon the stay-put provision of the IDEA.  On October 2, 2006, Plaintiff filed its cross motion for a stay of the ALJ's decision.  On October 6, 2006, Plaintiff and Defendants filed their respective cross-motions for summary judgment.

## II.    STANDARD OF REVIEW

In <u>Board of Education v. Rowley</u>, the Supreme Court announced the standard of review which federal courts must apply when reviewing an ALJ's decision under IDEA:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.

458 U.S. at 206.

The Third Circuit has described the "due weight" standard as "modified *de novo* review." <u>L.E. v. Ramsey Bd. of Educ.</u>, 435 F.3d 384, 389 (3d Cir. 2006) (citing <u>S.H.</u>, 336 F.3d at 270). Under this standard, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." <u>S.H.</u>, 336 F.3d at 270 (quoting <u>Knable v. Bexley City Sch. Dist.</u>, 238 F.3d 755, 764 (6th Cir.2001). "In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight." <u>L.E.</u>, 435 F.3d at 389 n.4 (quoting <u>Shore Regional High School Bd. of Educ. v. P.S.</u>, 381 F.3d 194, 199 (3d Cir. 2004)). "Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the nontestimonial, extrinsic evidence in the record would *justify* a contrary conclusion.' (emphasis added)." <u>Id.</u>

## III.    DISCUSSION

The District contends that its IEP offered D.C. a FAPE, and that the ALJ erred in

deciding otherwise.  In particular, the District contends that the IEP was appropriate because of overwhelming evidence that D.C. was no longer impaired by emotional problems in 2004, and that the ALJ erred in finding that D.C. had fragile self-esteem, anxiety, and obsessional thinking about school.  However, in making these findings, the ALJ relied on the testimony of Drs. Malamut and Shnaps, which testimony he determined was entitled to substantial weight.  This Court, having reviewed the administrative record, and having failed to find nontestimonial evidence to justify a contrary conclusion, must accept the ALJ's determination that the testimony of Dr. Malamut and Dr. Shnaps was credible.  See L.E. v. Ramsey Bd. of Educ., 435 F.3d at 389 n.4 (3d Cir. 2006).  In addition, for the reasons stated below, the Court further finds that the ALJ's determination that D.C. has fragile self-esteem, and anxiety and obsessional thinking about school, is supported by a preponderance of the evidence.  A preponderance of the evidence also supports the ALJ's finding that D.C. needs highly structured, small classes with hands on attention because of his fragile self-esteem, organizational deficits, and slow processing speed.

At the administrative hearing, witnesses for the District and D.C.'s parents agreed that D.C. suffered from attention deficit hyperactivity disorder (ADHD) and weakness in written expression.  However, the ALJ heard conflicting testimony on whether D.C. suffered from depression, anxiety, and fragile self-esteem.  Dr. Malamut, a neuropsychologist with experience developing and assessing remedial education plans, spent a full day evaluating D.C. and concluded that D.C. suffered from fragile self-esteem, and thus, he was at great risk of recurring anxiety and depression if placed in a nonsupportive academic environment.  AR 68; Malamut Tr. 9.  Dr. Shnaps, a psychiatrist who treated D.C. since 2001, also found that D.C. suffered from depression, not otherwise specified, with anxious and obsessional features, and that in particular,

D.C. was obsessional and ruminative about school work.  AR 108; Shnaps Tr. 19.  Dr. Shnaps

concluded that D.C. needed to be in a special needs school and that "in a different environment

he is at high risk for emotional decompensation and ongoing crisis the outcome of which it will

be difficult to predict."  Id. at 109.

   Nancy Tonkin, a learning disabilities teacher consultant for the District, testified that the

District did not believe that D.C. had depression, anxiety, or self-esteem issues.  Tonkin Tr. 197.

Ms. Tonkin testified that she did not observe anxiety, depression, or fragile self-esteem when she

administered testing to D.C., and also noted that D.C.'s teacher at the Bridge School, Elizabeth

Barrett, stated in an evaluation that D.C. was often in a happy mood.  Tonkin Tr. 142; AR 189.

Stacy Shanks-Kohler, a school psychologist for the District, also testified that she found, during

her interview with D.C., that "he had a very positive affect" and that she "wasn't concerned

about anything socially, emotionally with him."  Kohler Tr. 14.

   However, Dr. Malamut and Dr. Shnaps testified that D.C.'s "happy" appearance at school

or during an interview was not inconsistent with his emotional problems.  Dr. Malamut explained

that the differences in the BASC mood/behavior scales that were completed by D.C.'s teachers

and D.C.'s parents, with the teachers rating D.C. in the normal range, but the parents' results

showing clinically significant elevations in subscales involving anxiety and depression, did not

mean that D.C.'s parents' responses were invalid, but rather, that D.C.'s behavior differed

depending on the environment.  Malamut Tr. 104; AR 57.  Dr. Malamut also explained that

discrepancies between home and school are common when children are comfortable in their

school environment.  Id. at 39.  Similarly, Dr. Shnaps expounded that while "[t]he outside

impression is that [D.C.] comes across as well related, well groomed and appropriate... all along

14

my impression has been that under this pleasant demeanor his mood has been in essence

depressed and anxious." Shnaps Tr. 21-22; AR 108. Significantly, Ms. Tonkin and Ms. Shanks-

Kohler both testified that they were not trained to diagnose these conditions. Tonkin Tr. 57, 139,

151, 165; Kohler Tr. 61.

The District's social history of D.C., based on social worker Jody Budoff's interview with

D.C.'s parents, also supports Dr. Malamut's and Dr. Shnaps' portrayal of D.C. as appearing

happy and social at times but still facing great problems with his self-esteem and anxiety. The

social history reported that D.C.'s parents "feel that socially this school year has been [D.C.'s]

best year ever" but that D.C.'s parents also believe that he "still has issues regarding self-esteem"

and that D.C. experienced "sheer panic when faced with something he was unsure of" at school.

AR 98.

Dr. Malamut and Dr. Shnaps also explained the risk of recurring anxiety and depression

in D.C. Dr. Malamut stated that even though D.C.'s treatment for depression, including

medication, was effective in that he was not depressed when she saw him in 2003, "the variables

that lead up to depression are still there" such that "if we put him in a stressful environment and

take away his medication, I suspect that you would see the depression resurface again." Malamut

Tr. 45. Dr. Malamut further explained that she did not diagnose D.C. with depression when she

evaluated him in November 2003 because she knew that D.C.'s depression was being addressed

by Dr. Shnaps, and not because it was not an issue for D.C. Malamut Tr. 44. Similarly, Dr.

Shnaps explained that while medication for depression has been helpful to D.C., D.C. could

become depressed again in a week, if a stress were added to his school environment. Shnaps Tr.

28, 34. While Dr. Shnaps did write, in a completed questionnaire that was sent to the Solebury

School Director of Admissions, that D.C. did not have a history of depression requiring treatment, his testimony was clear that he wanted to write a recommendation that emphasized D.C.'s positive qualities, and that he also thought that depression would not be an issue for D.C. at the Solebury School because of the special program and classes offered there.  Shnaps Tr. 121; AR 214.

The testimony of Drs. Malamut and Shnaps that D.C. had fragile self-esteem, anxiety, and obsessional thinking about school was found credible by the ALJ, who had an opportunity to hear and observe the demeanor of these witnesses, as well as all others.  The ALJ's credibility determination is therefore due special weight, under L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 n.4 (3d Cir. 2006).  Giving deference to the ALJ's determination that the testimony of Dr. Malamut and Dr. Shnaps was entitled to substantial weight, and this Court finding, as well, that the District's witnesses, Ms. Tonkin and Ms. Budoff, gave inadequate consideration to the findings and recommendations of Dr. Malamut and Dr. Shnaps, the Court concludes that the ALJ's finding that D.C. had fragile self-esteem, anxiety, and obsessional thinking about school is supported by a preponderance of the evidence.

The District also contends that the ALJ erred in finding that the IEP was not reasonably calculated to provide D.C. with meaningful education benefit because it failed to give sufficient consideration to D.C.'s disability in the context of his underlying issues of anxiety and fragile self-esteem.  Upon review of the record, the Court finds that this finding is also supported by a preponderance of the evidence.  Dr. Malamut observed classes at Montgomery High School in November 2004, and concluded that Montgomery High School's classes were too large and not sufficiently hands-on for D.C. because of his emotional fragility.  Malamut Tr. 77-78.  While, as

16

the District points out, Dr. Malamut testified that she reached her opinion that the District's

program was inappropriate for D.C. after visiting the high school, but prior to seeing the actual

IEP document, she also testified that when she visited Montgomery High School in November

2004, Joanne Tonkin, who had participated in the development of the IEP, explained the options

that were available for D.C. at Montgomery High School and chose the three classes that Dr.

Malamut visited because they were part of what the District had recommended for D.C.

Malamut Tr. 109-10. Dr. Malamut's observations were therefore connected to D.C.'s IEP. Dr.

Malamut also reviewed the IEP document prior to testifying at the administrative hearing that the

IEP was not appropriate for D.C. Malamut Tr. 82.

  When Dr. Malamut first observed the in-class support physics class at Montgomery High

School, she was accompanied by John Mazellan, a Montgomery High School social worker.

Both Dr. Malamut and Mr. Mazellan testified that although there were 15 students in the physics

class that day, that Mr. Mazellan told Dr. Malamut that there were 28 enrolled in the class. Mr.

Mazellan also testified that he later discovered that he had misspoken and that there were only 17

students enrolled in the class, although he never informed Dr. Malamut of the correct number.

Mazellan Tr. 69-71. Nancy Novack also testified that the three sections of the in-class support

physics classes for the 2004-2005 school year were smaller in size than the 25-28 students cited

in Dr. Malamut's report and testimony, with two sections of 18 students each and a third section

with 23 students. Novack Tr. 99; AR 518. Ms. Novack further testified that the special

education classes at Montgomery High School satisfy New Jersey special education regulations

on class size. Novack Tr. 136-37. Nonetheless, Dr. Malamut's testimony is clear that the in-

class support physics class that she observed was too large for D.C., even with only the 15

17

students who were present that day and with both a regular and a special education teacher in class.  Malamut Tr. 117.  Dr. Malamut explained that there is no "magic number" for class size for D.C., because it depended on how well the teachers effectively monitored and engaged the class.  Malamut Tr. 117-18.  In that regard, Dr. Malamut also testified that there was not enough structure in the class for D.C., because the two teachers were doing different things at the same time.  Malamut Tr. 56.

Dr. Malamut further testified that the special education students were not sufficiently included in the class, and that the special education teacher had made a derogatory comment that would have crushed D.C. due to his fragile sense of self-esteem.  Malamut Tr. 52-53, 55.  In contrast, Mr. Mazellan testified that he did not hear the teacher make any derogatory comment during the class.  Mazellan Tr. 49.  However, Mr. Mazellan also provided testimony that was consistent with Dr. Malamut's observations, stating in particular that there was less interaction between the special education students and the regular teacher than there was between the regular education students and the teacher, and that the special education teacher was writing separately on the board during part of the class.  Mazellan Tr. 45, 69.

Dr. Malamut also observed the Replacement English 9 class and concluded that the class was too easy for D.C. based on "the book they were reading, the sentences that they were writing, the level of instruction."  Malamut Tr. 127.  However, Dr. Malamut also testified that, in coming to this conclusion, she did not review the curriculum guide or the textbook.  Malamut Tr. 127-28.  Nonetheless, while Nancy Novack testified that Replacement English 9 and regular ninth grade English use the same curriculum and textbook, Ms. Novack also testified that the regular curriculum is modified in terms of pacing and reading level before it is used in the Replacement

English 9 class, which is not inconsistent with Dr. Malamut's observations.  Novack Tr. 108.

Finally, Dr. Malamut, accompanied by Ms. Tonkin, observed the learning strategies class, and concluded that it was not sufficiently hands-on for D.C.  Malamut Tr. 58-59.  However, Dr. Malamut only observed the class for ten to fifteen minutes, and Ms. Tonkin testified that multiple types of teaching, which Dr. Malamut did not have a chance to observe, are used in the learning strategies class.  Malamut Tr. 58-59; Tonkin Tr. 75-76.  Nonetheless, Ms. Tonkin also testified that direct teaching is not always the method used in the class, which is consistent with Dr. Malamut's observations about the class.  Id.

Dr. Malamut's testimony is consistent with the ALJ's determination that the IEP was not reasonably calculated to provide D.C. with a meaningful educational benefit because it failed to give sufficient consideration to D.C.'s disability in the context of his underlying issues of anxiety and fragile self-esteem.  Dr. Malamut testified that because of D.C.'s self-esteem and anxiety issues, D.C. required classes that are highly structured, hands-on, and small, and that provide a high level of reinforcement and encouragement.  Malamut Tr. 42.  Dr. Malamut further testified that after observing classes at the high school, she did not believe that the high school could provide classes that were sufficiently small, structured, and hands-on for D.C.  Id. at 56, 77-78.  Because the ALJ found the testimony of Dr. Malamut and Dr. Shnaps credible after hearing live testimony, the ALJ's credibility determinations are due special weight, under L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 n.4 (3d Cir. 2006).  Furthermore, I have reviewed the inconsistencies in these witnesses' reports and testimony as cited by the District and have discussed them in this opinion.  I do not find that these issues rise to the level of questioning the ALJ's credibility determinations and the weight he assigned to these experts' opinions.  Thus, giving deference to

the ALJ's determinations that the testimony of Dr. Malamut and Dr. Shnaps was entitled to substantial weight, and having reviewed the record in its entirety, the Court concludes that the ALJ's finding that the IEP was not reasonably calculated to provide D.C. with meaningful educational benefit because it failed to give sufficient consideration to D.C.'s disability in the context of his underlying issues of anxiety and fragile self-esteem is supported by a preponderance of the evidence.

The District also argues that D.C.'s success at the Solebury School supports its position that D.C. would have succeeded under its proposed IEP, since the Solebury School does not primarily specialize in educating students with learning disabilities. This argument is unavailing, however, because D.C. is enrolled in the learning skills program at Solebury, where he has a one-on-one English class, and one-on-one tutoring and coordination of assignments. Brown Tr. 56. D.C.'s group classes at Solebury are also small, ranging in size from under 10 to 16. Brown Tr. 76-79. Indeed, Dr. Malamut testified that Solebury was appropriate for D.C. because the classes were small, very structured, and engaging, in contrast to her observations at Montgomery High School. Malamut Tr. 62-69.

The District further argues that because Dr. Malamut's observations at Montgomery High School took place after the development of the IEP, her opinion goes to the implementation of the IEP and cannot be given credence because the District never had an opportunity to implement the IEP. In so arguing, the District relies on Furhman v. East Hanover Bd. of Ed., 993 F.2d 1031, 1040 (3d Cir. 1993), for the proposition that Dr. Malamut's visit to Montgomery High, three months after the IEP was developed, is impermissible. However, the District's reliance on Furhman is misplaced, as the case states that a student's progress subsequent to the development

of an IEP cannot be substituted for <u>Rowley</u>'s determination of a reasonable calculation of

educational benefit, and does not suggest that an IEP cannot be evaluated through visits to the

proposed classes three months after the IEP's development.  993 F.2d 1040.  The Court is thus

unconvinced by this argument.

The District also alleges that Dr. Malamut did not apply the correct standard, under the

IDEA, that an appropriate IEP is one that offers the potential for significant learning and

meaningful benefit, and instead she opined on which school would best meet D.C.'s academic

needs.  IDEA does not require the best possible education, but rather, a free appropriate

education, or one that provides meaningful benefit to the child.  <u>See</u> <u>Polk v. Central Susquehanna</u>

<u>Intermediate Unit</u>, 853 F.2d 171, 178 (3d Cir. 1988) (discussing <u>Rowley</u>, 458 U.S. at 189).  The

District points to a January 6, 2005 letter in which Dr. Malamut renders an opinion "regarding

which school would best meet [D.C.'s] academic needs" and concludes that "the Solebury

School is the perfect fit for [D.C.]."  AR 518, 521.  However, Dr. Malamut subsequently

testified, at the administrative hearing, that the Montgomery High School program was not

appropriate for D.C. under the IDEA standard, and not simply that she considered Solebury the

"best" school for D.C.[2]  Malamut Tr. 77.  Indeed, as pointed out herein, Dr. Malamut devoted a

substantial portion of her testimony and opinions to the inappropriateness of the Montgomery

High School IEP and that it would not provide D.C. with a meaningful educational benefit

---

[2]During the administrative hearing, counsel for the District objected to Dr. Malamut being permitted to testify on which schools were appropriate for D.C., on the basis that her testimony should be limited to her written report, in which she opined solely on what was the best program for D.C.  Malamut Tr. 73-742.  The ALJ allowed Dr. Malamut to testify on which school was appropriate for D.C., noting that Dr. Malamut's testimony was subject to cross examination and that the ALJ would decide what weight to give to the testimony.  Malamut Tr. 76.

because the District's plan did not incorporate and consider D.C.'s disability in the context of his verified emotional difficulties. The Court therefore does not accept the District's contention that Dr. Malamut did not apply the proper standard under IDEA.

Finally, the District contends that the ALJ incorrectly placed the burden of proof on the District. After the close of the administrative hearing, but prior to the issuance of the ALJ's decision, the Supreme Court shifted the burden of proof in an administrative hearing challenging an IEP to the party seeking relief. Schaffer, 546 U.S. 49. A review of the ALJ's decision makes clear that the ALJ properly placed the burden of proof on D.C.'s parents, as petitioners. While the ALJ's conclusions in that regard do not repeat his review of the entire record, which appears earlier in his opinion, he clearly understood and applied the proper burden of proof. First, the ALJ noted the then-recent change in the law and specifically found that the "petitioners have shown that the individualized education program offered by the District would not have provided [D.C.] with a free appropriate public education for the 2004-2005 school year." AR 29-30. In that connection, the ALJ stated that "[k]ey to the resolution of this matter is the appropriate weight to accord to the expert opinions," and found that the petitioners' witnesses, Dr. Malamut and Dr. Shnaps, "were candid and credible witnesses whose opinions were based on facts and reasonable analysis." AR 28-29. The ALJ therefore placed substantial weight on the testimony of Dr. Malamut and Dr. Shnaps, in concluding that D.C.'s parents, as petitioners, had sustained their burden of showing that the IEP would not have provided D.C. with a FAPE for the 2004-2005 school year.

This Court has found that the ALJ's findings are supported by a preponderance of the evidence, and thus, the Court grants Defendant's motion for summary judgment and denies

Plaintiff's motion for summary judgment.  As a result, consistent with the ALJ's opinion, D.C.'s parents are entitled to reimbursement for D.C.'s tuition at the Solebury School for the 2004-2005 school year.

## IV.    INTERIM RELIEF

In their motion for interim relief, D.C.'s parents seek payment for D.C.'s placement at the Solebury School during the pendency of these proceedings based upon the stay-put provision of the IDEA.  D.C.'s parents assert that the ALJ's December 22, 2005 decision in their favor made the Solebury School D.C.'s stay-put placement.  D.C.'s parents further assert that the District should bear financial responsibility for D.C.'s tuition at Solebury beginning on July 19, 2005, the date that they allege that D.C.'s stay-put placement would have begun had the ALJ rendered his decision in a timely fashion.

The stay put or pendent placement provision of the IDEA requires that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child... until all such proceedings have been completed."  20 U.S.C. § 1415(j).  The Third Circuit has held that a final administrative decision that the parents' unilateral placement is appropriate creates a new pendent placement for the child because the administrative decision constitutes an agreement by the State and the parents to change the educational placement of the child.  Susquenita School District v. Raelee S., 96 F.3d 78, 83 (3d Cir. 1996).  D.C.'s parents assert that, under Susquenita, the ALJ's December 22, 2005 decision that the unilateral placement of D.C. at the Solebury School was appropriate created a new pendent placement for D.C., for which the District is financially responsible.

23

In contrast, the District contends that the Solebury School is not D.C.'s pendent

placement because, in contrast to the administrative decision in <u>Susquenita</u>, here the ALJ did not

state in his decision that the Solebury School was D.C.'s pendent placement.[3]   However, the

Third Circuit does not state in <u>Susquenita</u> that a final administrative decision creates a new

pendent placement only if the ALJ specifically states that there is a new pendent placement.

Moreover, the Third Circuit's holding in <u>Susquenita</u> was based on the statutory language and

purpose of the IDEA, as well as the Supreme Court's holding in <u>School Committee of Town of</u>

<u>Burlington, Mass. v. Dept. of Ed. of Mass.</u>, 471 U.S. 359 (1985), and none of these sources

support the District's position.

In <u>Burlington</u>, 471 U.S. 359, 372 (1985), the Supreme Court held that a ruling by an

education appeals panel in favor of the parents' position constituted an agreement for purposes of

Section 1415(e)(3) of the Education for the Handicapped Act ("EHA"), the predecessor to

Section 1415(j) of the IDEA.   The Court in <u>Burlington</u> made no mention of any requirement that

the administrative decision specify the pendent placement as well.   Moreover, the policies

underlying the IDEA, which the Third Circuit relied upon in <u>Susquenita</u>, refute the District's

position here.   Importantly, the Third Circuit noted:

> [A] pendent placement [that] cannot be altered by an administrative ruling in the
> parents' favor... would mean that the panel decision in favor of the parents is of no
> practical significance unless and until it is affirmed by a decision that cannot be or
> is not appealed.   As we have explained, section 1415(e)(3) was drafted to guard
> the interests of parents and their children.   We cannot agree that this same section
> should be used here as a weapon by the Susquenita School District to force
> parents to maintain a child in a public school placement which the state appeal

---

[3]The District also requests a stay of the ALJ's order directing it to reimburse the tuition
for the 2004-2005 year.   However, the Court's issuance of its decision on the cross-motions for
summary judgment renders moot the District's motion for a stay.

> panel has held inappropriate.  It is undisputed that once there is state agreement
> with respect to pendent placement, *a fortiori*, financial responsibility on the part
> of the local school district follows.

Susquenita, 96 F.3d at 84 (footnote omitted).

Moreover, courts have not interpreted Susquenita as requiring that the administrative decision

specify the pendent placement.  See, e.g., Chester Township Board of Education v. J.R., 2000

WL 33418868, *4 (D.N.J. 2000); Matthew K. v. Parkland School District, 1998 WL 84009, at

*4-5 (E.D.Pa. 1998); St. Tammany Parish School Board v. State of Louisiana, 142 F.3d 776, 783

(5th Cir. 1998).  I agree, and find that the ALJ's decision here created a pendent placement under

the IDEA.

    Yet, the District also argues that it should not be responsible for D.C.'s tuition pending

the resolution of this matter because the appropriateness of the Solebury School has only been

put at issue for the 2004-2005 year, and not for subsequent years.  While the Third Circuit has

not specifically addressed this point, Plaintiff's argument is not supported by the policies

underlying the IDEA, which were relied on in Susquenita and Burlington.  Although the issue

before the Court in Burlington was retroactive reimbursement after a unilateral placement was

deemed appropriate on the merits, and not payment on an on-going basis for a pendent

placement, the Court relied on the policies underlying the IDEA in concluding that parents whose

unilateral placement was deemed appropriate should be retroactively reimbursed.  471 U.S. at

370.  Noting that the review process is "ponderous," such that "[a] final judicial decision on the

merits of an IEP will in most instances come a year or more after the school term covered by that

IEP has passed," the Court stated that "it would be an empty victory to have a court tell them

several years later that they were right but that these expenditures could not in a proper case be

reimbursed by school officials" because "[i]f that were the case, the child's right to a *free* appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete."  Id.

Similarly, in Susquenita, the Third Circuit noted the financial consequences of the "inevitable" delay in the review process, and concluded that "the concerns cited by the Court [in Burlington] in support of retroactive reimbursement favor including the interim assessment of financial responsibility in the range of relief available under the IDEA."  96 F.3d at 86.  "Without interim financial support, a parent's 'choice' to have his child remain in what the state has determined to be an appropriate private school placement amounts to no choice at all."  Id.  "The prospect of reimbursement at the end of the litigation turnpike is of little consolation to a parent who cannot pay the toll at the outset."  Id.  Furthermore, "[i]n concluding that the school district cannot avoid interim responsibility for funding what the state has agreed is an appropriate pendent placement, we are mindful of the financial burden which will, in some instances, be borne by local school districts," id., but "[t]here is no doubt that Congress has imposed a significant financial burden on the States and school districts that participate in IDEA."  Id. (quoting Florence County School District Four v. Carter, 510 U.S. 7, 15 (1993)).  Therefore, contrary to the District's assertion, during the pendency of the appeal, placing financial responsibility on the school district for school years subsequent to the year for which the IEP is at issue is necessary to provide parents with anything but an "empty victory," in light of the lengthy review process.

The stay put provision of the IDEA "represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their

current educational placement until the dispute with regard to their placement is ultimately resolved." 96 F.3d at 83 (citing Drinker v. Colonial School District, 78 F.3d 859, 864-65 (3d Cir. 1996)). Moreover, courts have held school districts responsible for pendent placement including years subsequent to the year for which an IEP is at issue. See, e.g., Matthew K. v. Parkland School District, 1998 WL 84009, *7 (E.D.Pa. 1998) ("pendent placement is an entirely independent determination" from the determination of the appropriate placement for the following school year); County School Board of Henrico County, Vir. v. RT, 433 F.Supp.2d 692 (E.D.Va. 2006); Board of Education of the Poughkeepsie City School District v. O'Shea, 353 F.Supp.2d 449, 459 (S.D.N.Y. 2005) ("pendency placement and appropriate placement are separate and distinct concepts").

Having found that D.C.'s pendent placement was established in the ALJ's December 22, 2005 decision, the Court must determine when the District's financial responsibility for this pendent placement begins. The Third Circuit has stated that the school district should bear financial responsibility as soon as an administrative panel or judicial decision establishes the pendent placement. Susquenita, 96 F.3d at 85. Under Susquenita, the District would be responsible for D.C.'s tuition at the Solebury School as of the ALJ's December 22, 2005 decision and through the pendency of the proceedings. S.C., on behalf of D.C., acknowledges that a school district's financial responsibility generally takes effect on the date that an administrative decision in the parents' favor is issued, but asserts that here, because the administrative decision was rendered late through no fault of D.C.'s parents, the District's responsibility should run from the date that the administrative decision should have been rendered, and not the date that it was untimely issued. In support of this argument, S.C. points to Mackey v. Board of Education for

the Arlington Central School District, 386 F.3d 158, 164-65 (2d Cir. 2004), in which the Second

Circuit vacated a district court ruling that the school district did not need to reimburse the parents

for tuition when the administrative decision in favor of the parents was rendered after the school

year at issue, even though the administrative decision had been delayed eleven months through

no fault of the parents.  The Second Circuit found that "such an outcome, if permitted to stand, is

unfair to the parents," because "[i]f the SRO had issued its order within thirty days of the

District's November 9, 2000 receipt of the parents' request for review of the IHO's decision,

Maplebrook would have been found to be T.M.'s pendency placement from December 9, 2000

forward, and the parents would, without question, have been entitled to tuition reimbursement on

a pendency basis for at least part of the 2000-2001 school year."  Id. at 164.  "Only because the

SRO was derelict, through no fault of the parents... the reimbursement to which they would

otherwise have been entitled from the District disappeared."  Id.  "The District, by the district

court's decision, was allowed to escape the financial consequences of pendency placement for

which the District otherwise would have been responsible."  Id. at 164-65.

　　In remanding to the district court in Mackey, the Second Circuit specifically directed the

district court to Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 86 F.Supp.2d 354, 367

(S.D.N.Y. 2000), for guidance in determining the date that a school district's financial

responsibility begins when an administrative decision is untimely rendered.  In Murphy, the

administrative decision in favor of the parents was issued nearly three months late for reasons

unknown and without the parents' consent.  Id.  The court noted that "it would be unfair to

penalize Plaintiffs for the delay, which they neither caused nor agreed to," and that "if such

unjustified delays in the SRO review process are countenanced, school districts and the State will

have strong incentive to delay administrative decisions as a means of deferring, or worse yet, avoiding financial responsibility."  Id.  The court in Murphy therefore ordered the school district to reimburse the parents for tuition starting on the date the administrative decision should have been rendered, and not the date that the decision was untimely issued.  Id.

In Mackey, the Second Circuit relied on the Supreme Court's opinion in Burlington, 471 U.S. 359 (1985), even though Burlington addressed a different issue – retroactive reimbursement after a unilateral placement was deemed appropriate on the merits.  Nevertheless, the Second Circuit in Mackey noted, "[i]n both cases... the parents were due reimbursement that had been denied them by the simple passage of time, not because they were not entitled, under the IDEA, to the relief they sought."  Mackey, 386 F.3d at 165.  The Second Circuit further commented that the Supreme Court held in Burlington that "[r]eimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP," Mackey, 386 F.3d at 165 (quoting Burlington, 471 U.S. at 370-71), and that the argument for retroactive reimbursement was "even stronger here than in Burlington because in that case there was apparently no delay based on a statutory time limit, as there is here."  386 F.3d at 165.

Although the Third Circuit has not addressed the effect of a late administrative decision on a school district's financial responsibility, in Susquenita, the Third Circuit found that "the concerns cited by the Court [in Burlington] in support of retroactive reimbursement favor including the interim assessment of financial responsibility in the range of relief available under the IDEA."  96 F.3d at 86.  The Third Circuit noted, in particular, that placing the financial consequences of delay on parents would render "the child's right to a free appropriate public

education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards... less than complete." Id. (quoting Burlington, 471 U.S. at 369-70).  In light of the policies underlying the financial burden of pendent placement recognized by our Circuit, I find persuasive the Second Circuit's analysis in Mackey that the financial consequences of delay not be borne by parents whose position has been vindicated by an ALJ.

In the present case, under Susquenita, had the ALJ rendered his decision in a timely fashion, the District would have been financially responsible for D.C.'s placement on that date.  As in Mackey, the District should not be able to escape this financial responsibility, which it would have had to bear had it developed a proper IEP in the first instance, simply because the administrative decision was delayed through no fault of D.C.'s parents.  Rather, the District is responsible for D.C.'s tuition payments at Solebury as of the date that the ALJ's decision should have been rendered.  Here, the parties agree that under the OAL's interpretation of N.J.A.C. § 1:6A-18.1, the ALJ was legally required to issue his decision on July 19, 2005, or no later than 45 days after the last brief was filed on June 4, 2005.  However, the ALJ's decision states that the last post-hearing submission was received on July 8, 2005, and that the record closed on that date.  AR 14.  Thus, the decision was due 45 days later, or August 22, 2005.  The Court therefore finds that the District is responsible for D.C.'s tuition payments at Solebury beginning on August 22, 2005, since that was the date from which D.C.'s pendent placement should have begun.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment affirming the decision of the ALJ is granted and Plaintiff's motion for summary judgment is denied. Therefore, consistent with the ALJ's opinion, D.C.'s parents are entitled to reimbursement for

D.C.'s tuition at the Solebury School for the 2004-2005 school year.  In addition, based upon the stay-put provisions of the IDEA, Defendant's motion for interim relief is granted, and the District is therefore responsible for D.C.'s tuition payments at Solebury beginning on August 22, 2005. Finally, because the Court has issued its decision on the cross-motions for summary judgment, Plaintiff's cross-motion for a stay of the ALJ's decision is denied as moot.




<u>/s/ Freda L. Wolfson</u>

_____ The Honorable Freda L. Wolfson
United States District Judge


Date:   January 26, 2007


_____

31